**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **Michael Hunt, et al.,** | : | **Case No. 3:10 CV 2896** |
| **Plaintiffs,** | : | **Magistrate Judge Vernelis K. Armstrong** |
| **v.** | : | **Memorandum Decision and Order** |
| **City of Toledo Law Department, et al.,** | : | |
| **Defendants.** | : | |

The parties have consented to the Magistrate's jurisdiction in this civil rights case filed pursuant to 42 U. S. C. § 1983.  Pending are Defendants' Motion for Summary Judgment (Docket No. 28),  Plaintiffs' Opposition  (Docket No. 36) and Defendants' Reply (Docket No. 39).  For the reasons that follow, the undersigned  Grants Defendants' Motion for Summary Judgment but retains jurisdiction over Plaintiffs' Excessive Force Claim.

**I.  Jurisdiction**

This Court has jurisdiction over the subject matter and the parties pursuant to 28 U. S. C. §§ 1331, 1343.

## II.  Parties.

**(1)**  Plaintiff Michael Hunt at all times relevant to these proceedings, was an adult male citizen of the United States,  residing at 2082 North 12th Street, City of Toledo, County of Lucas, State of Ohio 43620.

**(2)**  Plaintiff Janet Hunt at all times relevant to these proceedings, was an adult female citizen of the United States, residing at 2082 North 12th Street, City of Toledo, County of Lucas, State of Ohio 43620.

**(3)** Defendant City of Toledo is a municipal entity in the State of Ohio, which engages and employs police officers.[1]

**(4)** Defendant Officers John Does, City of Toledo, are various unnamed law enforcement officers engaged or employed by the City of Toledo, Department of Police

**(5)**  Defendant Detective Eric Sweat is a police/law enforcement officer detective engaged or employed by the City of Toledo, Department of Police.

## III  Procedural Background.

On December10, 2010, the above named Plaintiffs filed their Complaint with Jury

Demand in the Lucas County Court of Common Pleas, Civil Division, Lucas County, Ohio, Case

NO. CI 02010 08269, alleging deprivation of civil rights under 42 U.S.C. § 1983.  (Docket No.

1).  On December 22, 2010, Defendants filed a Notice of Removal pursuant to 28 U.S.C. § 1441,

alleging federal question as the basis of jurisdiction.  (Docket No. 1).  On February 25, 2011,

Defendants filed their Answer to Plaintiffs' Complaint with a Jury Demand  (Docket No. 7)**.**

On March 7, 2011, pursuant to 28 U.S.C. § 636(c) and  Fed.R.Civ.P. 73, U.S. District

Court Judge David A. Katz issued an Order of reference, pursuant to the parties' consent,

transferring this case to the undersigned for all further proceedings and entry of judgment

---

[1]    Plaintiffs named as a Defendant the "City of Toledo Law Department." (See Docket No. 1, Attachment No. 1, Complaint).  However, an action against a department of a political subdivision, the governmental entity is the real party in interest and not the department itself. See, e.g., Wilson v.Stark Cty. Dept. of Human Resources, (1994) 70 Ohio St.3d 450,453. Accordingly, the City of Toledo is the real party in interest in this case.

(Docket No. 11).

On January 18, 2012, prior to the issuance of this Court's Order on Defendant's Motion for Protective Order,[2] Defendants filed a Motion for Summary Judgment (Docket No. 28). On April 12, 2012 Plaintiffs filed an Opposition, and on May 7, 2012 Defendants filed a Reply (Docket No. 36 and 40, respectively)

The is case is presently before this Court on the matters raised in Defendants' Motion for Summary Judgment.

**IV. Factual Background**.

Set forth below is a general narrative of the events that gave rise to this case

●During the evening of March 24, 2010, approximately six members of the City of Toledo Department of Police, in furtherance of the execution of a Search Warrant, entered premises located at 2082 North 12th Street, Toledo, Ohio. (Docket No. 1, 3, Docket No. 28, Attachment No. 1, Sweat Affidavit).  This action (raid) was undertaken pursuant to an ongoing investigation of the alleged sale of crack cocaine by a person named Gabrial Taylor, an alleged drug dealer (Docket No. 1, Attachment No 1, Complaint;  Docket No. 28, Attachment No. 1, Sweat Affidavit; Docket No. 36, Attachment No. 8, Sweat Deposition, 17-18).

●Plaintiffs Michael Hunt and Janet Hunt resided in, and were occupying, the North 12th premises at the time of the above referenced  raid.   (Docket No. 1, 3).

●Approximately one month prior to the raid of the North 12th Street location, a Confidential Informant allegedly told Toledo Police Detective Eric Sweat that he/she had observed Gabrial Taylor selling crack cocaine from an apartment, purportedly claimed to have been 2082 N. 12th Street  (Docket No. 28, Attachment No. 1, Affidavit of  Sweat).

●Upon receiving this information Detective Sweat, assisted by Sergeant Steven Harrison, commenced surveillance of what they claimed was this location.  Detective Sweat alone or with Detective Harrison surveilled what they claimed was this location on several occasions (Docket No. 36, Attachment No. 8, Sweat Deposition. at pp. 18,21; Docket No. 28, Attachment No. 1, Sweat Affidavit; Docket No. 18, Attachment No. 1, Sweat Affidavit for Search Warrant; Docket No. 36, Attachment No. 7, Harrison Deposition, 13-17).

---

2    On May 18, 2011, Defendants' filed a Motion for Protective Order.  On June 8, 2011, Plaintiffs filed an Opposition.  On June 30, 2011, Defendants filed their Reply.  (Docket Nos. 17, 18 and 20, respectively).  On January 27, 2012 this Court issued its Memorandum Opinion and Order denying Defendants' Motion for Protective Order (Docket No. 32)

●On March 22, 2010, two days before the raid, Det. Sweat orchestrated a controlled buy of crack cocaine from a location that he stated was 2082 N. 12th Street, utilizing his Confidential Informant to purchase the contraband (Docket No. 28, Attachment No. 1, Sweat Affidavit; Docket No. 28, Attachment No. 7, Crime Report).  Pursuant to a drug field test performed immediately after the controlled buy, the substance purchased by the CI was determined to be cocaine, thereby confirming the Detective's belief that criminal activity was occurring in the residence from which the substance was purchased, which apartment Detective Sweat believed to be 2082 N. 12th Street, i.e., Plaintiffs' apartment. (Docket No. 36, Attachment No. 8, Sweat Deposition, l4, 38; Docket No. 28, Attachment No. 1, Sweat Affidavit; Docket No. 18, Attachment No. 1, Sweat Affidavit for Search Warrant).  Detective Sweat's CI also advised Det. Sweat that, while he was inside the apartment making the buy, he had observed a gun in the apartment. (Docket No. 36, Attachment No. 8, Sweat Deposition, l4, 38; Docket No. 28, Attachment No. 1, Sweat Affidavit; Docket No. 18, Attachment No. 1, Sweat Affidavit for Search Warrant).

●On March 24, 2010, Det. Sweat applied to the Toledo Municipal Court for a "night season no-knock" search warrant, supported by his affidavit,  of the Plaintiffs' apartment located at 2082 N. 12th Street,  the location Det. Sweat believed to have been the site of on going criminal activity (Docket No. 36, Attachment No. 8, Sweat Deposition, 36; Docket No. 28, Attachment No. 1, Sweat Affidavit; Docket No. 18, Attachment No. 1, Sweat Affidavit for Search Warrant).  On that date, a Toledo Municipal Court Judge issued the search warrant (Docket No. 18, Attachment No. 1 Sweat Affidavit for Search Warrant, Attachment No. 2, Search Warrant).

●At approximately 9:45 P.M. on March 24, 2010, Det. Sweat along with about a half a dozen members of the   Toledo Police Department's Directed Patrol unit  executed the Search Warrant and conducted a search of Plaintiffs' apartment.  The unit made a forced entry of Plaintiffs' apartment, secured the premises and the Plaintiffs and conducted a search of Plaintiffs' apartment. (Docket No. 28, Attachment No. 1, Sweat Affidavit).  The search uncovered a small amount of marijuana, rolling papers, a marijuana joint, baggies and marijuana stems, a loaded 22 caliber handgun and rounds of ammunition.  All items were seized as evidence. (Docket No. 28, Attachment No. 1, Sweat Affidavit and Attachment No. 3, Crime Report, and Attachment No. 6, Inventory and Receipt).

●No crack cocaine, drug purchases activities or other items or materials indicative of illegal crack cocaine procession or distribution activities as referenced in the Search Warrant were observed by law enforcement in or about the premises during or after the raid.  (Docket No. 18, 5, 6, 11).

●Plaintiffs were handcuffed,  arrested and charged with possession of marijuana, and obstructing official business. (Docket No. 28, Attachment No. 1, Sweat Affidavit E. Sweat and Attachment No. 7, Crime Report),  the former charge being dismissed with court costs and fine only.  (Docket No. 18, 5, 14).  The handgun seized by the Toledo Police Department during the raid was eventually returned to Plaintiffs (Docket No. 11).   On August 27, 2010, both Plaintiffs Michael and Janet Hunt plead no contest to the obstruction charges and were found guilty of obstructing official business by a Toledo Municipal Court Judge (Docket No. 28, Attachment No. 1, Sweat Affidavit and Attachment No. 8 Journal Details).

4

Below are additional alleged facts relevant to the various claims raised on

summary judgment.

**Complaint,** pp.1-9, Docket No. 1,  Attachments # 1 (filed with removal 12/22/2010). Lucas Co. CCP, case number CI10-8239 (December 10, 2010):  ● Gabrial Taylor never resided in 2082 N. 12th Street, and Plaintiffs Hunts do not know him p. 3 (¶ 3) ●Defendants threatened and assaulted and intimidated and frightened Plaintiffs without just cause, p. 3  (¶ 5) ●Defendants verbally harassed Plaintiffs with threats of jail and bodily violence if they challenged Defendants.  p. 4, (¶ 7)  ●Defendants severely and forcibly handcuffed the Plaintiffs, including injuring the wrists of Mr. Hunt and caused him to shed blood.  p. 4,  (¶ 8)  ●The actual location of the illegal activity was 2080 N. 12 St. p. 5, ¶ 12  ●As of the time of the raid, Plaintiffs had resided in 2082 North 12th Street for 21 years and there had been no complaints, but the lease at  2080 North 12th Street was not renewed and there had been police calls to and about North 12th Street p. 5 ¶ 12a ●police had prior knowledge that the pending raid was tainted, p. 5, ¶ 14  ●"That police officers did engage in physical acts against the Plaintiffs wherein excessive force was used against the Plaintiffs by the officers to subdue the Plaintiffs including displaying and brandishing guns accompanied with dire threats of their usage against the Plaintiffs." p. 6, ¶ 16

**Deposition of Detective Eric Sweat** (by Attorney Tolliver), Docket No. 18, Attachment No. 3, May 13, 2011, pp. 1-65:  ●Detective Sweat received information and instruction on proper police methods of obtaining a search warrant, received continuing education and has a training officer.  pp. 8-9, p. 10, ln.16-18  ●The CI first gave Det. Sweat information about the crack cocaine activity at Beacon Place apartments, and the name and description of Gabrial Taylor, and the police files on Taylor indicated that he sold out of other people's residences.  p. 15, ln 11-12, p. 15, 16, 17 (p. 17, ln 22-23) ●Det. Sweat engaged in pre-raid surveillance, occurring on multiple dates, each occurrence lasting 30 minutes to several hours during the night.  p. 18,  p. 24 ●Det. Sweat did not consult with management prior to the raid, but on other occasions did consult with management, and claimed he could not find any information about the residents of 2082 prior to the raid.  p. 43, ln 11-16,  p. 53-54, p. 54-55  ●It was alleged that Det. Sweat was told on several occasions, by different people, including Plaintiffs, during the raid that he had the wrong location, but he didn't recall being told this. p. 45, ln. 15-21,  p. 50, ln. 17-23  ●Det. Sweat acknowledged that Plaintiffs were handcuffed during the raid to control them.  p 52 , ln. 7-11,  p. 53, ln 1-7.

**Crime Report** (signed by Det. Sweat, marked as exhibit B) Docket No. 28, Attachment No. 3, dated March 22, 2010, time 2030), p. 1:  ●The report of the CI controlled buy of March 22, 2010, at 2030 hours, does not identify address from  which controlled buy was made.  It identifies as the location of the occurrence, 525 Erie Street and states that the CI made a purchase and the evidence was booked.  The report also states, "Please see supplemental reports for  further details."  No supplemental reports were provided, however,  re: the events of March 22, 2010

**Deposition of witness Johnnie M. Feagins** (by Attorney Green) Docket No. 36, Attachment

No. 4,  September 9, 2011, pp. 1-23:  ●lives at 2084 N. 12 Street, p. 3, ln. 24-25  ●Feagins had lived there around three years as of the date of deposition, was a surgical technician at St. Vincent's hospital, now retired, was the Plaintiffs' next door neighbor, and has known them ever since she moved into Beacon Place. p. 4, ln 10-18 , p. 4,  p. 7, ln 1-18, p. 7, ln 20-22.  ●She heard the activity the night of the raid, and she stated that a neighbor named "Rita" told the police that the were raiding the wrong residence p. 7-8, p. 9, ln 2-20.  ●She stated that questionable activities were occurring at the 2080 N. 12th Street location, an apartment then occupied by a Zandra Williams, next door to Plaintiffs,  for some time, activities going on at the apartment complex before the raid, including people going in and out of 2080  day and night; she could see it from her bedroom window, and that people would be in the apartment for 15 to 45 minutes, that there was a constant stream of men going in and out,  that she thought it might be prostitution, but her daughter suggested to her it might be drugs, and that it was well known and a topic of conversation. p. 11, p. 12, ln. 1-9,  p. 12, ln 17 - p. 13 ln 11, p 13, ln 18-23, p. 14, ln 18-19,  p. 15, ln 5-18.  p. 15 ln p.19 - 16. ln. 2, p. 16, ln 3-14.; p.17 ln 6 - p. 18 ln. 1,  p.  18 ln 14-23,  p. 19, ln 15-24, p. 19,

**Deposition of witness Steve A. Bankey** (by Attorney Green) Docket No. 36, Attachment No. 5, September 9, 2011, pp. 1-29:  ●Bankey was employed by Beacon Place apartments for three years as the maintenance man, his regular hours were 8:30 am through 5:30 pm Monday through Friday, and his responsibilities included general maintenance work, which included periodic checks of the lighting system in the complex during the night.  p. 4 ln 5 - p. 5. ln 9, p. 5 ln 23 - p 6 ln 22, p. 9 ln 1-11  ●He was knowledgeable of the activities of both 2080 and 2082 N. 12th Street and believed that the raid should have been on 2080 because there was always questionable activity going on there, including guys going in and out and people sneaking out of the back window late at night. p. 8 ln. 14-22.  He observed this activity in 2010, p. 9,  p. 10.  ●In December, 2009, as well as 2010 while doing late night light checks, he observed different people going in and out of Williams's apartment, 2080 and they would stay up to 45 minutes, and he never saw those people there during the day, he believed it was suspicious, and he knew that Williams had a background of drug activity, including crack.  p. 10 ln 12-17,  p. 10 ln 19-22, p. 10 ln 23-25,   p. 11,  p. 12-13,  p, 16 ln 18 p. - 20 ln. 5. ●Bankey stated that he confronted Williams, although it was  not part of his official duties, but did it out of concern for the property, p. 13-14  ●Bankey knew Williams's history because she told him p. 16, ln 9 ●Concerning 2082, Bankey stated that "No, No, not late at night.  There's never been any activity going on there."  p. 22, ln 20-21 ●Responding to questions from Plaintiffs' counsel Tolliver; he stated that when he was on the grounds he never saw activity at 2082 similar to the activity observed at 2080, and never heard other tenants complaining about 2082.  p. 25 ln 2 - 15,  p. 25-26.

**Deposition of witness Jackie L. Brady** (by Attorney Green), Docket No. 36, Attachment No. 6, September 9, 2011, pp. 1-23:  ●Brady worked at Beacon apartments as the property manager since March, 2011, but was not employed there in March, 2010 p. 7, p. 9  ●She provided records for the tenant of 2080 Beacon, Zandra Williams for sometime in March, 2010, which included two former signed leases and one complaint, and the records indicate that Williams vacated the apartment, and that she had received warnings from the management on March 24, 2010.  p. 11-

12, p. 13-14, pp. 16-17, 19 ● These records regarding Zandra Williams contain notations referring to loud and boisterous behavior, loitering and excessive hanging out and written comments about "Several complaints and concerns about your company hanging out in front of your apartment at all hours of the night being loud.  This is not acceptable behavior.  .  . I will not tolerate this behavior   You have 72 hours to resolve this matter" p. 21 and p. 21 ln. 15-20.

**Deposition of police officer TPD Sergeant Steven Harrison** (by Attorney Tolliver), Docket No. 36, Attachment No. 7, February 15, 2012, pp. 1-58:  ●Sgt. Harrison was present at the premises during the raid of March 24, 2010, which was conducted with members of the SED, Special Enforcement Division, who wore protective vests and masks and were armed, and raid was initiated with entry being facilitated by the use of a battering ram to break open the front door.    p. 8, p. 9, ln 13-15, p. 9 ln.11 -23, p. 10, p. 10 ln 21 - p. 11 ln 7  ●The raid lasted about 45 minutes. p. 12 ln 21 - p. 13 ln 3  ●He participated in pre raid surveillance two to three times with Det. Sweat, doesn't remember precise dates, but it commenced between two weeks to a month before the raid, these surveillances would last from 5 to 30 minutes, every time he was there Sweat was there, but Sweat may have done a surveillance without him.  p. 13 ln 4 - 13,  p. 14 ln 11 - p. 17 ln 16. ●Q. "Okay. And do you have knowledge that the gun found at the location of the Hunts was returned to the Hunts after the court matters were over?"  A. "I don't know if it was or not"  Q. "Okay. If such a gun was returned to the Hunts, and they were alleged to be involved in drug trafficking of crack cocaine, would you return such a gun to such a person?" 18 A. "No, sir".  p. 37, ln. 10-18

**Affidavit of Sgt. Steven Harrison,** Docket No. 39, Attachment No. 3,  May 7, 2012,  pp. 1-2 : ●"Whenever a confidential informant is used in an investigation, Det. Sweat and I were trained to not keep written notes so as to protect the identify (sic) of the confidential informant." ¶ 8

## V.  Standard of Review for Summary Judgment

Motions for summary judgment are governed under Rule 56 of the Federal Rules of Civil

Procedure.  The standard for summary judgment is set forth in Rule 56(a):

> (a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).[3]

---

[3]   Rule 56 is revised to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used

Rule 56 compels summary judgment when it can be shown that a party, who will bear the burden of proof as to an issue at trial,  cannot establish an essential element of that issue. <u>Celotex v. Catrett</u>, (1986) 477 U.S. 317.  Conversely, the party moving for summary judgment is obligated to specifically identify the basis upon which the motion is brought and to reference those parts of the record that establish that there is no dispute regarding a genuine issue of material fact. <u>Id</u>.

The reviewing court shall not weigh evidence or make credibility determinations. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); <u>Schreiber v. Moe</u>, 596 F.3d 323, 333 (6th Cir.2010). Rather, the court is to peruse such evidence as has been presented with an eye toward drawing all reasonable inferences and construe the evidence and reasonable inferences in a light most favorable to the non-moving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); <u>Biegas v. Quickway Carriers, Inc</u>., 573 F.3d 365, 374 (6th Cir.2009).

If the party moving for summary judgment has met (or appears to have met) that burden, the party against whom the motion was sought is then responsible for adducing particular facts

---

in many courts. The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Subdivision (a). Subdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), <u>changing only one word--genuine "issue" becomes genuine "dispute."</u> "Dispute" better reflects the focus of a summary-judgment determination. As explained below, "shall" also is restored to the place it held from 1938 to 2007.

Advisory Committee Notes to 2010 Amendments to Rule 56 .  (emphasis added)

which show the existence of a genuine dispute of material. For the non-moving party to meet this burden it must produce more than a "mere scintilla" of evidence  to support its claim. Anderson v. Liberty Lobby, Inc.,  477 U.S. at 255-56.   An opposition to a properly supported summary judgment motion may not rely exclusively on mere pleading allegations to show the existence of a genuine dispute of material fact. Fed.R.Civ. P. 56(e); Anderson, 477 U.S. at 248, 251.

A plaintiff must, however, provide more than the claims asserted in the pleadings, and must identify more than just a "metaphysical doubt" or a  hypothetical "plausibility" that may emerge from a murky reference to an absence of evidence.  Rather a plaintiff is obliged to come forward with "specific facts," based on "discovery and disclosure materials on file, and any affidavits," showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(c); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  See Chappell v. City Of Cleveland, 585 F.3d 901, 912 (6th Cir. 2009).  See also Anderson, 477 U.S. at 252, 106 S.Ct. 2505 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict—whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." (emphasis in original) (internal quotations omitted)).

### Summary Judgment and § 1983 Claims, the Immunity Defense

In the instant case Defendants assert that summary judgment should be granted in their favor because "Defendants are immune under 42 U.S.C. §1983 and RC§§2744.02(B) and 2744.03(A)(6)." (Docket No. 28, 6).  In the context of a 42 U.S.C. § 1983 action, where a defendant has, as in the instant case, raised the defense of qualified immunity, the Sixth Circuit

9

has held that:

> [s]ummary judgment ... is proper if the law did not put the officer on notice that his conduct would be clearly unlawful. However, if genuine issues of material fact exist as to whether the officer committed acts that would violate a clearly established right, then summary judgment is improper.

Vakilian v. Shaw, 335 F.3d 509, 515 (6th Cir.2003). (citing Higgason v. Stephens, 288 F.3d 868, 876 (6th Cir.2002); Poe v. Haydon, 853 F.2d 418, 425–26 (6th Cir.1988)).  "Summary judgment is also improper where the reasonableness of an officer's action depends on a disputed issue of fact."  Scozzari v. Miedzianowski, 454 Fed.Appx. 455, 462 (6th Cir.2012).See also Leonard v. Robinson, 477 F.3d 347, 355,  (6th Cir.2007).

## VI.  Plaintiff's Causes of Action

Although not specifically denominated as such in Plaintiffs' Complaint, a reasonable construction of that Complaint shows that Plaintiff has asserted the following six causes of action.  Pursuant to its review of Plaintiffs' Complaint, this Court finds itself in essential agreement with Defendants and recognizes five of the six Causes of Action outlined by Defendants extant in Plaintiffs' Complaint.  However, this Court disagrees with Cause of Action No. 2 identified by Defendants, i.e. that Plaintiffs alleged Defendants Sweat and John Does subjected them cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution, and finds that such Cause of Action is not present in the Complaint.[4]

---

[4]  As indicated Plaintiffs' Complaint does not set forth Causes of Action or claims for relief specifically and explicitly identified as such.  In their Motion for Summary Judgment (Docket No. 28) Defendants present six Causes of Action that they propose are advanced in Plaintiffs' Complaint.  Rather, review of Plaintiffs' Complaint shows that Plaintiffs have plead an excessive force claim.  (Complaint, Docket No. 1, p. 6, ¶ 16).  Accordingly, this Court finds an excessive force claim as Plaintiffs' Cause of Action No. 2.

**Cause of Action No. 1**: Plaintiffs allege Defendants Sweat, and John Does subjected them to illegal search and seizure in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution and the provisions of the Ohio Constitution.
**Cause of Action No. 2**: Plaintiffs allege Defendants Sweat and John Does subjected them to excessive force in violation of the Fourth Amendment to the U.S. Constitution
**Cause of Action No. 3**: Plaintiffs assert a "negligent training" claim against Defendant "City of Toledo Law Department" and City of Toledo.
**Cause of Action No. 4**: Plaintiffs assert a state claim for Assault and Battery against Defendants Sweat and John Does.
**Cause of Action No. 5**: Plaintiffs assert a state claim for Infliction of Emotional Distress against Defendants Sweat and John Does
**Cause of Action No. 6**: Plaintiffs allege a conspiracy claim against Defendants Sweat and John Does to cover up the violations of Plaintiffs' constitutional rights.

**VI. Discussion**

**§ 1983 Liability Generally**

This lawsuit arises under 42 U.S.C. § 1983 as well as state law. The Plaintiffs assert that the Defendants have, under color of law, deprived Plaintiffs of clearly established rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution of which a reasonable person would have known. These rights include, but are not limited to, the right to due process of law and the right to be free of unreasonable searches and seizures

To prove liability under § 1983 a plaintiff must "establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." Sigley v. City of Parma Heights, 437 F.3d 527, 533 (6th Cir.2006) (citations omitted).

The Defendants in this action do not dispute the assertion that from the initial undertaking of the surveillance that lead to the raid of Plaintiffs' residence through the time of Plaintiffs' arrest and including all other relevant events that occurred during the execution of the

11

search warrant that they were acting under the color of state law. This being so, the remaining question is simply whether Defendants caused the Plaintiffs to suffer a deprivation "of a right secured by the Constitution or laws of the United States" and were harmed thereby. Id.

A general principle in evaluating § 1983 claims is that not all unfair, unwise, or imprudent actions of persons or entities acting under the color of state law are, necessarily, constitutionally unreasonable. See Kostrzewa v. City of Troy, 247 F.3d 633, 639 (6th Cir.2001). Courts routinely acknowledge that police and other law enforcement officials are allowed "latitude for honest mistakes," even when those mistakes may seem implausible or at least difficult to understand when viewed through the rear view mirror of time and from the unadorned narrative of the written record. See Maryland v. Garrison, 480 U.S. 79, 87, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987).

Yet, there is a countervailing principle that also serves to guide courts in their review of these cases: that the Constitution was not created to inflate the authority of the state and its police powers over the individual, and that each and every citizen is guaranteed meaningful, constitutional rights that the state, through its police powers, and law enforcement officials, individually, may not violate. See Champion v. Outlook Nashville, Inc., 380 F.3d 893, 900 (6th Cir.2004). See, e.g., Holland v. Harrington, 268 F.3d 1179, 1194–95 (10th Cir.2001) ("At all times, SWAT officers no less than others ... must keep it clearly in mind that we are not at war with our own people.")

Lawsuits under § 1983 frequently provide "the only realistic avenue for vindication of constitutional guarantees," Champion, 380 F.3d at 901 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Yet, it is also true that such suits impose a

12

cost on society, "including 'the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office.'" Id. In this regard it is well acknowledged that governmental officials, including, and maybe especially, law enforcement officers, will not be able to perform their jobs safely or effectively, if they are compelled to consider that their every momentary decision may be analyzed and dissected with knowledge obtained only through hindsight. See Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Kostrzewa, 247 F.3d at 639. See also Cline v. City of Mansfield, 745 F.Supp.2d 773, 788-89 (N.D. Ohio, E.D. 2010).

**Individual Liability**

For a plaintiff to show that such a violation occurred, they must be able to establish the propriety of recovery from any particular party. See Petty v. County of Franklin, Ohio, 478 F.3d 341, 349 (6th Cir.2007). Accordingly, the analysis of a § 1983 claim commences with the preliminary requirement that a plaintiff must establish that a particular defendant proximately caused the claimed constitutional deprivation. It is also true, however, that the proximate cause issue in the context of § 1983 can, sometimes, be quite "murky." Wright v. City of Canton, 138 F.Supp.2d 955, 965 (N.D. Ohio 2001). Additionally, even where it can be shown that a law enforcement official proximately caused the deprivation of a constitutional right, that official will not be held liable unless that right was "clearly established" and the official has caused the deprivation in an "objectively unreasonable manner." See Champion, 380 F.3d at 901. See also Cline v. City of Mansfield, 745 F.Supp.2d 773, 788 (N.D. Ohio, E.D. 2010); Rush v. City of Mansfield,, F.Supp.2d 827, 834 (N.D. Ohio, E.D. 2011). With this concern in mind, the courts have acknowledged that the conduct and actions of law enforcement personnel may not

13

necessarily have been  unreasonable to the officer acting in the immediacy of those moments under what, at that time, may have been the reasonable perception of threat to life and safety. See Kostrzewa, 247 F.3d at 639.

**Qualified Immunity**

It is the foregoing perspective that informs and justifies the doctrine of qualified immunity, which  provides a balancing point to the inevitable clash of competing, fundamental interests that are invariably brought to the fore in the context of 1983 claims.  This balancing principle holds that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Champion, 380 F.3d at 901.

Qualified immunity is a defense not just against liability, but against suit itself. Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009). Hence, the immunity questions should be resolved as early in the litigation as possible. Id.  Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 343, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). Chappell v. City of Cleveland, 585 F.3d 901, 907 (6th Cir.2009) (citing Hunter v. Bryant, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (internal quotations omitted)).  Ward v. County of Cuyahoga, 721 F.Supp.2d 677, 688 (N.D. Ohio, E.D. 2010).

Qualified immunity will serve to shield a defendant law enforcement officer from liability regardless of "whether the official's error [was] 'a mistake of law, a mistake of fact, or a

mistake based on mixed questions of law and fact.'"  Pearson, 129 S.Ct. at 818. (citing Groh v.

Ramirez, 540 U.S. 551, 567, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004)).  In Saucier v. Katz, 533

U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court established a two part test

for determining the applicability of qualified immunity in § 1983 actions. First, "[t]aken in the

light most favorable to the party asserting the injury, do the facts alleged show the officer's

conduct violated a constitutional right?" Id. at 201, 121 S.Ct. 2151. Second, "if a violation could

be made out on a favorable view of the parties' submissions, the next . . . step is to ask whether

the right was clearly established." Id.

In a § 1983 action, it is the plaintiff's burden to show that the defendants are not entitled

to qualified immunity. Untalan v. City of Lorain, 430 F.3d 312, 314 (6th Cir.2005).  That is,

viewing the evidence in the light most favorable to him, the plaintiff must establish both that (1)

a constitutional right was violated and (2) that the right was clearly established at the time of the

violation. Scott, 550 U.S. at 377, 127 S.Ct. 1769; Harrison, 539 F.3d at 517..[5]

---

[5]  Unless the plaintiff can satisfy both prongs of the Saucier test, the courts will grant a
defendant's  motion for summary judgment on qualified immunity grounds.  Where it has been
demonstrated that a right was not clearly established at the time of the alleged violation (i.e., the
second part of the Saucier test), the court is not required to address the first question, even if
defendant did actually violate a right of the plaintiff.  See Pearson v. Callahan, 555 U.S. 223, 129
S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) ("The judges of the district courts and the courts of
appeals should be permitted to exercise their sound discretion in deciding which of the two
prongs of the qualified immunity analysis should be addressed first in light of the circumstances
in the particular case at hand.").  See also  Brosseau v. Haugen, 543 U.S. 194, 199–200, 125
S.Ct. 596, 160 L.Ed.2d 583 (2004); Chappell v. City Of Cleveland, 585 F.3d 901, 907 (6th Cir.
2009).

The essential idea informing the second prong of Saucier (i.e., whether the right in
question was "clearly established") is that "an official could not ... fairly be said to 'know' that
the law forbade conduct not previously identified as unlawful." Harlow, 457 U.S. at 818, 102
S.Ct. 2727.  It is as a consequence of the application of this principle that plaintiffs who have
sued under § 1983 must show that "in the light of pre-existing law," a reasonable officer would
have understood that the actions for which he now faces suit were unlawful. Champion, 380 F.3d

The Supreme Court and the Sixth Circuit have rejected the argument that a right is only clearly established where a plaintiff can show the existence of a "fundamentally similar" or "materially similar" case. Grawey v. Drury, 567 F.3d 302, 313–14 (6th Cir.2009) (quoting Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), explaining that the determining issue is whether the defendant law enforcement officer had fair warning that his actions were unconstitutional).

This interpretation of the requirements for proving that the right in question was clearly established entails that law enforcement officials are to be cognizant that their conduct may violate established law even in novel factual circumstances, i.e., where no precedent exists.  The crucial dispositive consideration in making the assessment of whether "a right is clearly established" is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. See Champion, 380 F.3d at 902 ("[T]he fact that various courts have 'not agreed on one verbal formulation of the controlling standard' does not by itself entitle an officer to qualified immunity." (quoting Saucier, 533 U.S. at 203, 121 S.Ct. 2151)). Because the emphasis of this analysis is on whether the officer had fair notice, at the time of the events under consideration, that his conduct was lawful (or otherwise), reasonableness is to be judged against the backdrop of the law that was current at the time of the conduct under examination. See Cline v. City of Mansfield, 745 F.Supp.2d 773, 798-90 (N.D. Ohio, E.D. 2010), Rush v. City of Mansfield, 771 F.Supp.2d 827, 834-36 (N.D. Ohio, E.D. 2011).

As a general rule, the default position is that qualified immunity applies.  However,

---

at 902

16

qualified immunity will not shield the officer from liability where it is obvious that no reasonably competent official would have concluded that the actions taken were lawful.  Ewolski v. City of Brunswick, 287 F.3d 492, 501 (6th Cir.2002). See also Russo v. City of Cincinnati, 953 F.2d 1036, 1042 (6th Cir.1992) ("For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right'" (quoting Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).[6]

**Municipal Liability**

In a § 1983 action, when a plaintiff seeks to recover damages from a municipality, it is not necessary that a  particular right the plaintiff claims was violated be "clearly established," as is the case in 1983 claims against individuals.  However, in an action against a municipality, the plaintiff must establish that the municipality itself was the proximate cause of the alleged deprivation. See Collins v. City of Harker Heights, 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); Ford v. County of Grand Traverse, 535 F.3d 483, 495–96 (6th Cir.2008).

---

[6]  "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." Feathers, 319 F.3d at 848   "[I]n an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law." Sample v. Bailey, 409 F.3d 689, 699 (6th Cir.2005) (quoting Brosseau v. Haugen, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)). "[T]here need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." Cummings v. City of Akron, 418 F.3d 676, 687 (6th Cir.2005) (quoting Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope, 536 U.S. at 741, 122 S.Ct. 2508. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202, 121 S.Ct. 2151.  See also Binay v. Bettendorf, 601 F.3d. 640, 651-52 (6th Cir. 2010)

Concerning the municipal defendant, there is no vicarious liability for the alleged tortious acts of the municipality's agents in a 1983 action, rather:

> It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under § 1983.

Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); see also Board of County Commis. v. Brown, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.") (citation omitted).

Succinctly stated,  a plaintiff must show that the municipality itself was the wrongdoer to impose § 1983 liability upon a local governmental body.  Collins v. City of Harker Heights, 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

A plaintiff can establish that a municipality is the proximate cause of a violation under any of five theories: (1) express municipal policy, Monell, 436 U.S. at 660–61, 98 S.Ct. 2018, (2) "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law," City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (quotation omitted), (3) the decision of a person with final policy making authority, Pembaur v. City of Cincinnati, 475 U.S. 469, 481–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), (4) the failure to act where the "inadequacy [of the existing practice is] so likely to result in the violation of constitutional rights, that the policymaker . . . can reasonably be said to have been deliberately

18

indifferent to the [plaintiff's rights]," City of Canton v. Harris, 489 U.S. 378, 390, 109 S.Ct.

1197, 103 L.Ed.2d 412 (1989), or (5) ratification by a municipality of its employee's

unconstitutional acts by failing to investigate and punish meaningfully allegations of

unconstitutional conduct, Fuller v. City of Oakland, 47 F.3d 1522, 1535 (9th Cir.1995); see also

Leach v. Shelby County Sheriff, 891 F.2d 1241, 1247 (6th Cir.1989); Wright, 138 F.Supp.2d at

966 ("[Plaintiff] can establish his municipal liability claim by showing ... [that] a final municipal

policymaker approved an investigation ... that was so inadequate as to constitute a ratification of

their alleged use of excessive force."). See Cline v. City of Mansfield, 745 F.Supp.2d 773, 790

(N.D. Ohio, E.D. 2010). See also Rush v. City of Mansfield, 771 F.Supp.2d 827, 836-37 (N.D.

Ohio, E.D. 2011).

In the instant case, regarding all the causes of action asserted by Plaintiffs, and having

reviewed the record evidence presently before it, this Court has found no evidence that creates a

genuine dispute of material fact regarding the liability of the City of Toledo as to any of

Plaintiffs' claims.

**Cause of Action No. 1**: **Search and Seizure**, **Validity of Search Warrants, Affidavits and Source Information, and Surveillance**

Plaintiffs assert that the search warrant that lead to the raid of March 24, 2010, was

invalid due to allegedly erroneous information contained in the warrant and the associated

affidavit.  If the warrant were invalid, then Plaintiffs were subjected to an unconstitutional

search. See, e.g., Cline v. City of Mansfield, 745 F.Supp.2d 773, 800 (N.D. Ohio, E.D. 2010).[7]

---

[7]  However, the converse is not true, since it is quite possible for a warrant to pass constitutional muster but for various other aspects of a search to be unreasonable.  Baranski v. Fifteen Unknown Agents of the BATF, 452 F.3d 433, 441 (6th Cir.2006) (en banc).  See also United States v. Basham, 268 F.3d 1199, 1204 (10th Cir.2001)).

When analyzing the soundness of a warrant a court will look to the affidavit for search warrant that supported the issuance of the warrant.  See United States v. Frazier, 423 F.3d 526, 531 (6th Cir.2005).  ("To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate 'a fair probability that evidence of a crime will be located on the premises of the proposed search.' " (quoting United States v. Jenkins, 396 F.3d 751, 760 (6th Cir.2005))).

Where a search warrant is issued on the basis of an invalid affidavit the warrant will, too, be invalid,  and law enforcement officers may not execute a search warrant when the supporting affidavit is "so lacking in probable cause as to render official belief in its existence entirely unreasonable' or . . .  where the officer's reliance on the warrant was neither in good faith nor objectively reasonable." United States v. McPhearson, 469 F.3d 518, 522 (6th Cir.2006) (quoting United States v. Leon, 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)).   See also United States v. Hodson, 543 F.3d 286, 293 (6th Cir.2008) ("[A] reasonably well trained officer in the field, upon looking at this warrant, would have realized that the search described  . . . did not match the probable cause described . . . ."); cf. United States v. Washington, 380 F.3d 236, 241 (6th Cir.2004) ("[I]t is entirely possible that an affidavit could be insufficient for probable cause but sufficient for 'good-faith' reliance.").   "When determining whether an affidavit establishes probable cause, we look only to the four corners of the affidavit; information known to the officer but not conveyed to the magistrate is irrelevant." United States v. Brooks, 594 F.3d 488, 492 (6th Cir.2010) (citing United States v. Pinson, 321 F.3d 558, 565 (6th Cir.2003)).

The courts have also acknowledged that, even with the best efforts of law enforcement,

_____

mistakes can happen, but not all mistakes will render a warrant invalid. <u>See</u> <u>United States v.</u> <u>Johnson</u>, 558 F.Supp.2d 807, 812 (E.D. Tenn.2008) ("The Supreme Court and the Sixth Circuit have recognized that despite best efforts, inaccurate information, such as a wrong address, may get into the affidavits for search warrants . . . ") (<u>citing</u> <u>United States v. Pelayo–Landero</u>, 285 F.3d 491 (6th Cir.2002)).  However, this principle does not apply to major discrepancies. <u>See</u> <u>Knott v. Sullivan</u>, 418 F.3d 561, 569 (6th Cir.2005) ( "[I]n this case, the errors in the search warrant and affidavit were so extensive that there was a reasonable probability that the wrong vehicle could have been mistakenly searched.").  <u>See</u> <u>Cline v. City of Mansfield</u>, 745 F.Supp.2d 773, 800, 804 (N.D. Ohio, E.D. 2010).

The Sixth Circuit's decision in <u>United States v. Laughton</u>, 409 F.3d 744 (6th Cir.2005) is instructive. In <u>Laughton</u>, the Sixth Circuit found that police were not entitled to rely upon an affidavit that did not "turn[ ] up some modicum of evidence, however slight, to connect the criminal activity described in the affidavit to the place to be searched." <u>Laughton</u>, at 749.  The affidavit did not contain any specific reference to the particular address identified on the face of the warrant, using only generic references to a "home" and a "residence." The Court found that such a "warrant fail[s] to establish any nexus whatsoever between the residence to be searched and the criminal activity attributed to the defendant in the affidavit." <u>Laughton</u>. at 746.[8]  <u>See</u> <u>Cline v. City of Mansfield</u>, 745 F.Supp.2d 773, 800, 806 (N.D. Ohio, E.D. 2010).

As to the validity of a warrant the question is whether ("a reasonably well trained officer

---

[8]   A dissenting opinion by Judge Gilman reasoned that references to a "home" and "residence" in the affidavit self-evidently referred to the location listed on the face of the warrant. <u>Laughton</u>. at 753 (Gilman, J., dissenting) ("To not link the affidavit's references to 'the home' and 'the residence' to Laughton and the stated address strikes me as an unwarranted hypertechnicality....").

in the field, upon looking at this warrant, would have realized that the search described  . . . did

not match the probable cause described . . . .”).  See United States v. Hodson, 543 F.3d at 293

In determining whether a police officer's reliance on the warrant was objectively reasonable, the

court must decide “whether a reasonably well-trained officer would have known that the search

was illegal despite the magistrate's authorization.” United States v. Weaver, 99 F.3d 1372, 1380

(6th Cir.1996). .  See  Cline v. City of Mansfield, 745 F.Supp.2d 773, 800, 807 (N.D. Ohio, E.D.

2010).  (“In this case, by contrast, it is clear that any reasonable officer who: (a) read the

affidavit, and (b) happened to discover that it referred exclusively to 618 Burns Street would

know that the affidavit did not reflect probable cause to search 347 South.”).

     Addressing the veracity of search warrants the Supreme Court has stated:

>      Judge Frankel, in United States v. Halsey, 257 F.Supp. 1002, 1005
> (S.D.N.Y.1966), aff'd, Docket No. 31369 (CA2, June 12, 1967) (unreported), put
> the matter simply: "[W]hen the Fourth Amendment demands a factual showing
> sufficient to comprise 'probable cause,' the obvious assumption is that there will
> be a  truthful showing" (emphasis in original). This does not mean "truthful" in
> the sense that every fact recited in the warrant affidavit is necessarily correct, for
> probable cause may be founded upon hearsay and upon information received from
> informants, as well as upon information within the affiant's own knowledge that
> sometimes must be garnered hastily. But surely it is to be "truthful" in the sense
> that the information put forth is believed or appropriately accepted by the affiant
> as true. It is established law, see Nathanson v. United States, 290 U.S. 41, 47, 54
> S.Ct. 11, 13, 78 L.Ed. 159 (1933); Giordenello v. United States, 357 U.S. 480,
> 485–486, 78 S.Ct. 1245, 1249–1250, 2 L.Ed.2d 1503 (1958); Aguilar v. Texas,
> 378 U.S. 108, 114–115, 84 S.Ct. 1509, 1513–1514, 12 L.Ed.2d 723 (1964), . . ..
> Because it is the magistrate who must determine independently whether there is
> probable cause, Johnson v. United States, 333 U.S. 10, 13–14, 68 S.Ct. 367,
> 368–369, 92 L.Ed. 436 (1948); Jones v. United States, 362 U.S. 257, 270–271, 80
> S.Ct. 725, 735–736, 4 L.Ed.2d 697 (1960), it would be an unthinkable imposition
> upon his authority if a warrant affidavit, revealed after the fact to contain a
> deliberately or reckless false statement, were to stand beyond impeachment.

Franks v. Delaware, 438 U.S. 154, 164-65, 98 S.Ct. 2674, 2681 (1978).

     While the Fourth Amendment commands that no warrant may issue but upon 'probable

cause,' the Supreme Court has long held that "the term 'probable cause' . . .  means less than evidence which would justify condemnation," Locke v. United States, 7 Cranch 339, 348, 3 L.Ed. 364 (1813).  Thus a determination that a warrant satisfies the 'probable cause' requirement could possibly rest upon evidence which would not be legally sufficient at a criminal trial. Draper v. United States, 358 U.S. 307, 311, 79 S.Ct. 329, 332, 3 L.Ed.2d 327. (1959).   As the Court stated in Brinegar v. United States, 338 U.S. 160, 173, 69 S.Ct. 1302, 1309, 93 L.Ed. 1879 (1949), "There is a large difference between the two things to be proved [guilt and probable cause], as well as between the tribunals which determine them, and therefore a like difference in the quanta and modes of proof required to establish them"  Thus hearsay may be the basis for issuance of the warrant  so long as there . . .  (is) a substantial basis for crediting the hearsay. See Jones v. United States, supra, 362 U.S., at 272, 80 S.Ct., at 736.

Regarding the nature and sufficiency of the evidence necessary to satisfy the "quanta' of evidence and truth required to establish the validity of a warrant,  the Supreme Court recognized that "an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant," as long as the magistrate is "informed of some of the underlying circumstances" that provide support for the conclusions reached by the affiant as set forth in the warrant and as well as the affiant's belief that the informant "whose identity  need not be disclosed . . .  was 'credible' or his information 'reliable.'" Aguilar v. State of Texas, supra, 378 U.S., at 114, 84 S.Ct., at 1514.

What is revealed by the foregoing is the recognition by the Supreme Court that

. . . the Fourth Amendment's commands, like all constitutional requirements, are
practical and not abstract. If the teachings of the Court's cases are to be followed
and the constitutional policy served, affidavits for search warrants, such as the
one involved here, must be tested and interpreted by magistrates and courts in a

23

> commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

U.S. v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 746 (1965)

The Sixth Circuit has held that the fact that an affidavit and a warrant contain an incorrect address does not in and of itself render the search warrant invalid. The Fourth Amendment only mandates that a warrant  "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; see United States v. Blakeney, 942 F.2d 1001, 1026 (6th Cir.1991).

When evaluating whether a warrant had described with the requisite degree of particularity the place to be searched, the Sixth Circuit has looked to "(1) whether the place to be searched is described with sufficient particularity as to enable the executing officers to locate and identify the premises with reasonable effort; and (2) whether there is reasonable probability that some other premises may be mistakenly searched." Knott v. Sullivan, 418 F.3d 561, 568 (6th Cir.2005).  Yet, the Court has acknowledged that a search warrant is not automatically invalidated due to an error in description.  United States v. Pelayo-Landero, 285 F.3d 491, 496 (6th Cir.2002). "The test for determining whether a search warrant describes the premises to be searched with sufficient particularity 'is not whether the description is technically accurate in every detail . . .'" Id. (citing U.S. v. Prout, 526 F.2d 380, 387-88 (5th Cir. 1976).  See also U.S. v. Hang Le-Thy Tran, 433 F.3d at 479-80 (6th Cir. 2006).

Several Sixth Circuit cases have stood for the proposition that a search warrant is not necessarily invalid despite containing an erroneous address.  See Key v. Grayson, 179 F.3d 996,

1000 (6th Cir.1999); Wheeler v. City of Lansing, 677 F.Supp.2d 965, 979-80 (W.D. Mich, S.D.

2010).  See also United States v. Pelayo-Landero, 285 F.3d 491, 496 (6th Cir.2002); Knott v.

Sullivan, 418 F.3d 561, 568-69 (6th Cir. 2005)

> The test for determining whether a search warrant describes the premises to be
> searched with sufficient particularity is not whether the description is technically
> accurate in every detail, but rather whether the description is sufficient to enable
> the executing officer to locate and identify the premises with reasonable effort,
> and whether there is any reasonable probability that another premises might be
> mistakenly searched.

See United States v. Durk, 149 F.3d 464, 465 (6th Cir.1998). (internal quotation marks and

citations omitted).

In the present case the affidavit for search warrant, which was attached to the search

warrant, contained the following relevant facts: it identified, with specificity,  the location where

the alleged criminal activity was believed to have been taking place, 2082 N. 12th Street, Toledo,

Ohio; it also identified the premises by its location within the Beacon Place apartment complex

(i.e., eleventh apartment from the corner), and described its outward physical appearance;  it

stated that a confidential informant had made a controlled purchase of crack cocaine within that

premises; it stated that the affiant, Detective Sweat, had observed the CI enter and leave the

premises at the time the controlled purchase was made, and it stated that Det. Sweat had

independently observed what appeared to be conduct, i.e., foot traffic,  indicative of criminal

activity happening within the premises on other occasions.  The search warrant identified the

same premises as the premises identified in the affidavit.   A review of the warrant and affidavit

shows that the warrant and affidavit, were, on their face, valid, and provided a reasonable basis

for the officers who executed the search warrant to have believed that there was criminal activity

occurring within the premises identified therein.

25

Plaintiffs have presented no evidence that creates a genuine dispute of material fact concerning the facial validity of the affidavit or the search warrant.  Accordingly, as to the John Doe police officer Defendants, this Court finds that there is no genuine dispute of material fact on the issue of whether they violated Plaintiffs' Fourth Amendment rights in executing the search warrant, and Defendants' Motion for Summary Judgment is granted as to these Defendants on this issue.

**Surveillance, Information Gathering and the Formation of the Affidavit and Warrant: Liability of Detective Eric Sweat**

A crucial consideration in this case is the issue of the manner in which Detective Sweat obtained the information that informed and was included in the affidavit and warrant.  Instructive on how the Sixth Circuit has addressed the issues of  surveillance, information gathering and affidavit/warrant formation in § 1983 cases are  Williams v. City of Detroit, 843 F.Supp. 1183 (E.D. Mich, S.D. 1994) and Hill v. McIntyre, 884 F.2d 271 (6th Cir.1989) .

In Williams Detroit police officers broke into and raided the home of Plaintiffs Elias and Betty Williams in a search for evidence of drug trafficking.  It was the wrong house.  The raid was based on a search warrant and supporting affidavit that was obtained by one of the Defendant police officers, Sergeant Murphy.  Three days prior to the raid Murphy sent a confidential informant to the make a drug buy.  The salient circumstances of the buy, as described in Murphy's affidavit, are that Murphy instructed the CI to go to a particular location, Murphy observed the CI enter that location and return to Murphy shortly thereafter.  Murphy's affidavit also stated that the CI told him that he/she went to the identified location and purchased cocaine.  Williams, 843 F.Supp. At 1184.

However, in addition to the information provided in the affidavit of Murphy, summarized

above, discovery also included a deposition of the CI.  According to that deposition and other information, the police were investigating reports of foot traffic in the area that was suggestive of illegal drug activity.  Contrary to what Murphy stated in his affidavit, the CI indicated that he was sent down an alley that ran parallel to the Williams's residence and, following the path of the foot traffic, came upon a house where a person was peering out a window behind some drapes.  That individual then came outside into the back yard and sold drugs to the CI.  The CI apparently never entered the location to which he had been instructed to go by Murphy.  According to the CI, Murphy could not have seen him enter the residence, since that never happened.   Murphy then picked up the CI after he returned from his trip down the alley.  Murphy and the CI then drove down the street and the CI pointed to the location where he had been instructed to go, as the house from which the individual who had sold him cocaine had exited.  Williams, 843 F.Supp. At 1184

In any event, when the Williams's house was searched it contained only the Williamses but no evidence of any drug activity.  Williams v. City of Detroit, 843 F.Supp. 1183, 1184 (E.D. Mich, S.D. 1994)

The Sixth Circuit has held that "[a]n action under § 1983 does lie against an officer who obtains an invalid search warrant by making in his affidavit, material false statements either knowingly or in reckless disregard for the truth." Hill v. McIntyre, 884 F.2d 271, 275 (6th Cir.1989) (citing Donta v. Hooper, 774 F.2d 716, 718 (6th Cir.1985) (per curiam), cert. denied, 483 U.S. 1019, 107 S.Ct. 3261, 97 L.Ed.2d 760 (1987)).[9]  See also Wilson v. Russo, 212 F.3d

_____

[9]  In Hill the Sixth Circuit derived its reliance on the above referenced standard on the holding of the Supreme Court in Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a suppression case where the Court undertook a Fourth Amendment analysis of

781, 786-87 (3d Cir.2000); <u>Hervey v. Estes</u>, 65 F.3d 784, 789 (9th Cir.1995); <u>Packer v. City of Toledo</u>, 1 Fed.Appx. 430, 433-342 (6th Cir. 2001) (unpublished opinion) (noting that the materiality of the false information used to procure a search warrant was a key issue in deciding whether to grant qualified immunity).  <u>See</u> <u>also</u>  <u>Vakilian v. Shaw</u>, 335 F.3d 509, 517-18 (6th Cir. 2003) (finding no genuine dispute of material fact, officer protected by qualified immunity)

      In <u>Hill</u>, as in <u>Williams</u>, police officers raided and searched the wrong house for narcotics. In <u>Hill</u>, the officer who had prepared the affidavit and obtained the warrant had misidentified the target location of the raid.  That is in the warrant and supporting affidavit the officer identified as the house (in which illegal drug activity was occurring) a house which was next door to the house where the drug dealing was actually occurring.  The source of the mistake of the officer in <u>Hill</u> was  information provided to the officer by an informant who had provided a description of the house to be searched.  In <u>Hill</u> the district court a directed verdict after the close of the plaintiff's case as to the validity of the warrant.  However, the Sixth Circuit reversed, determining that it was for a jury to decide whether the officer displayed a reckless disregard for

---

search warrants issued on the basis of false affidavits. <u>Hill</u>, 884 F.2d at 275.  The Supreme Court noted that only if "a false statement [was made] knowingly and intentionally, or with reckless disregard for the truth" and if, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause," would it conclude that there had been a violation of the Fourth Amendment. <u>Franks</u>. at 155-56, 98 S.Ct. at 2676.   In the context of a suppression hearing the court is the only factfinder.   However, in the context of a § 1983 action "factfinding under the <u>Franks</u> standard is the province of the jury. <u>Hindman v. City of Paris, Tex.</u>, 746 F.2d 1063, 1067 (5th Cir.1984)."  <u>Hill</u>, 884 F.2d at 275   <u>See also</u> <u>Yancey v. Carroll County</u>, 876 F.2d 1238 (6th Cir.1989). (a § 1983 case, remanding the issue to the trial court,  holding that the question of whether a judicial officer who had issued a search warrant would have done so even without the knowingly or recklessly false statement is one for the jury). <u>See also</u>  <u>Wolgast v. Richards</u>, 389 Fed.Appx. 494, 502 (6th Cir. 2010)

the truth when he mistakenly identified the house. Hill v. McIntyre, 884 F.2d 271, 275.[10]

The district court in Williams, supra, held that the circumstance of that case "present[ed] basically the same facts addressed by the Sixth Circuit in Hill" Williams, at 1185. That is, the Williams court concluded that Sgt. Murphy apparently replied on questionable information provided by an informant as did the affiant officer in the Hill case. As the court noted,

> There are factual questions remaining regarding the way in which Murphy verified that information. Given the fact that it appears that Murphy never observed the informant go inside 2638 Buena Vista [the Williams's home] as asserted in his affidavit, the reliability of the identification of the house is at issue. It is a question for the jury to decide if defendant Murphy acted with reckless disregard for the truth in obtaining a search warrant for 2638 Buena Vista. There exist material questions of fact concerning the care he took in identifying the house where the drug deal engaged in by his informant took place. The parties appear to agree that the deal did not take place in, or out of, 2638 Buena Vista. This false identification of the house in the affidavit in support of the search warrant is material. The question that remains is whether the misidentification of the house resulted from defendant Murphy's reckless disregard for the truth. It is clear that an officer's care, truthfulness, and intent at the time he applied for the warrant is one of fact for the jury. See, e.g., Hindman v. City of Paris, 746 F.2d 1063, 1067 (5th Cir.1984). As a result, the court will deny defendant Murphy's motion for summary judgment.

Williams v. City of Detroit, 843 F.Supp. 1183, 1185-86.[11]

------

[10]    The source of the officer's error in Hill was that the house described by the CI and the one ultimately identified by the officer resembled one another but that the officer had selected the Hill's house as the one described by the CI by reasoning that the CI had described the house from the perspective of a person standing on the porch looking out to the street rather than from the perspective of looking from the street toward the house. The court in Hill found there were a sufficient number of factual issues, e.g., deposition testimony from the officer that indicated that he had initially written down the Hill's address as an error of transcription, that a jury could have determined that the officer had been reckless in selecting the house that was ultimately targeted for the raid. Hill, 884 F.2d at 276.

[11]    It should be noted, however, that the consideration animating the decisions in Williams and Hill are not merely that there was an error in identifying the address where the illegal activity was taking place. As noted, previously, "[s]ubmitting the wrong address in the application for the warrant is a mistake that was reasonable under the circumstances ." Torian v.

In the instant case, there is evidence suggesting that Detective Sweat may have mis-identified 2082 N. 12th Street as the location within which the criminal activity was occurring as well as evidence that additional investigation could have shown that the offending location was actually 2080 N. 12th Street (see Deposition testimony of Feagins, Bankey and Brady, presented in detail, above as well as the crime report that identified the location of the March 22, 2010 buy as 525 Erie, not a 12th Street address). However, the record does not reveal any evidence that a jury could look to that would allow it to conclude that Detective Sweat either knowingly misidentified 2082 or was wanton or reckless in the manner in which he gathered evidence and reached the conclusion that 2082 was the site of the criminal activity. Unlike the Hill and Williams, supra, there is no evidence in the current case - either directly contradictory deposition testimony of the CI or conflicting statements by Detective Sweat or Sgt. Harrison - that create the possibility of a genuine dispute of material fact as to whether Defendant Sweat was wanton or reckless with respect to his surveillance, information gathering, or preparation of the affidavit and warrant. However, as noted more fully in the discussion, above, that the record may suggest that there is a genuine dispute of material fact regarding Detective Sweat being negligent in this

---

City of Beckley, 963 F.Supp. 565, 569 (S.D.W.Va.1997) (holding that a police officer who had applied for and executed a search warrant on an incorrect address was entitled to qualified immunity because he reasonably could have thought there was probable cause to seek the warrant). Rather, as noted by the Connecticut district court in Jones v. City of Bridgeport, CIV.3:99 CV 1523 (CFD), 2002 WL 272397 (D. Conn. Feb. 19, 2002) (unreported), these cases are distinguished from cases in which "the officer signing the affidavit supporting the search warrant made no effort to verify the accuracy of an address at which allegedly illegal activity was taking place." Jones v. City of Bridgeport, CIV.3:99 CV 1523 (CFD), 2002 WL 272397 at *7 See, e.g., Gonzalez v. Romanisko, 744 F.Supp. 95, 98–99 (M.D.Pa.1990), as well as from those cases, like Williams "in which factual issues remained at the summary judgment stage as to how a police officer verified particular information given to him, or the care that he took in verifying that information." Jones v. City of Bridgeport, CIV.3:99 CV 1523 (CFD), 2002 WL 272397 at *7

regard, the evidence does not establish a genuine dispute of material fact  on the matter of

whether Detective Sweat was wanton or reckless.  Accordingly, Plaintiffs have not presented a

sufficient evidentiary platform to allow this case to proceed beyond summary judgment on this

aspect of Plaintiffs' claim, and Defendants' motion for summary judgment is, in this regard,

granted.

**Cause of Action No. 2: Excessive Force**

Plaintiffs' claim that the Defendants violated Plaintiffs' Fourth Amendment rights by

employing excessive force during the execution of the search.  As previously noted in this

Memorandum Plaintiffs asserted an excessive force claim in their Complaint.  (See Plaintiffs'

Complaint, Docket No. 1, Attachment No. 1, p. 6, ¶ 16.)  Defendants, in their Motion for

Summary Judgment addressed six causes of action they identified as claims asserted by Plaintiffs

in their Complaint.  Among Plaintiffs' claims for relief identified by Defendants was an Eighth

Amendment Cruel and Unusual Punishment claim.  (See Docket No. 28, Defendants' Motion for

Summary Judgment, p. 2,  Cause of Action No. 2)   As discussed, _infra_, this Court has

determined that Plaintiff did not assert an Eighth Amendment Cruel and Unusual Punishment

claim and, accordingly, does not address said claim herein.

As to Plaintiffs excessive force claim, however, this Court finds that Defendants, in

failing to identify and address that claim, have, accordingly  failed to move for summary

dismissal of that claim.  Thus, Plaintiffs' excessive force claim stands as originally plead and this

Court retains jurisdiction over this claim.

**Cause of Action No. 3: Negligent Training**

Plaintiffs have asserted a claim of negligent training against Defendant political

subdivision, the City of Toledo.

Under 42 U.S.C. § 1983, a municipality cannot be held liable for unconstitutional actions of its employees under the theory of respondeat superior. See, e.g., City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); Monell v. Department of Soc. Servs. of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

In general, to establish that a municipality is liable under § 1983, a plaintiff must show an unconstitutional action that "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"   Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-59, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  or a "constitutional deprivation[ ] visited pursuant to governmental 'custom' even though such a custom has not received formal approval." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  To prevail on a § 1983 claim against a municipality, a plaintiff must show: (1) that he or she suffered a deprivation of a constitutionally protected interest; and (2) that the deprivation was caused by an official policy, custom, or usage of the municipality. Monell v. New York Dep't of Social Servs., 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipal liability for unconstitutional acts of employees cannot be established on the basis of respondeat superior, but rather requires proof that the municipality's policy or custom caused the harm. Id. at 694, 98 S.Ct. 2018.

 In a § 1983 action for negligent training of law enforcement officers, a municipality will be liable only where its "failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants [where] such a shortcoming [can] be properly thought of as a city 'policy or custom' that is actionable under § 1983." City of Canton,

Ohio v. Harris 489 U.S. 378, 388-89 109 S.Ct. 1197, 1204 (1989). See also Scott v. City of Cleveland, 555 F.Supp.2d 890, 895 (N.D. Ohio, E.D. 2008).

That is, a failure to train or supervise properly under section 1983 cannot be based only on simple negligence. Hays v. Jefferson County, 668 F.2d 869, 872 (6th Cir.1982). "A failure to train amounts to 'deliberate indifference' where state actors should have known, either because of a history of [constitutional rights] violations or because such likelihood was obvious, that [constitutional rights] violations were likely to result absent better training." League of Women Voters of Ohio v. Blackwell, 432 F.Supp.2d 723, 729 (N.D. Ohio 2005) (citing Harris, 489 U.S. at 390, 390 n. 4, 109 S.Ct. 1197).

Such conditions arise when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton, Ohio v. Harris, supra, 489 U.S.. at 390.

To prevail on a negligent training claim against a municipality a plaintiff must show: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir.2006). See also Morrison v. Board of Trustees of Green Tp., 529 F.Supp.2d 807, 823 (S.D. Ohio, W.D. 2007)

In the instant case Plaintiffs' proffered proof does not demonstrate either "a history of [constitutional rights] violations" or an obvious "likelihood ... that [constitutional rights]

33

violations were likely to result absent better training." <u>League of Women Voters of Ohio</u>, 432 F.Supp.2d at 729. <u>Morrison v. Board of Trustees of Green Tp</u>.529 F.Supp.2d 807, 824 (S.D. Ohio, W.D. 2007).   The record has revealed scant, if any, evidence that, if viewed in a light most favorable to them, would show that Defendant City of Toledo had failed to provide adequate training or supervision either as to surveillance, handling of confidential informants, preparation of affidavits for search warrants,  preparation of search warrants, or, finally, the execution of search warrant and the manner of conducting a raid.  Accordingly, this Court finds there is no genuine dispute as to any material facts regarding Plaintiffs' negligent training claim, and that, as to this claim, Defendants' Motion for Summary Judgment is Granted.

**Cause of Action No. 6: Conspiracy**

Plaintiffs assert a civil conspiracy claim against Defendants Sweat and John Does.

### Civil Conspiracy Generally

A conspiracy is  "an agreement by two or more persons to commit an unlawful act, coupled with an intent to achieve the agreement's objective, and (in most states) action or conduct that furthers the agreement; a combination for an unlawful purpose" <u>Black's Law Dictionary</u> (9th ed. 2009 Westlaw) A civil conspiracy is "[a]n agreement between two or more persons to commit an unlawful act that causes damage to a person or property."  <u>Id</u>. Accordingly, given the intrinsic necessity of both intent and agreement there can be no negligent conspiracy or, conversely, conspiracy to commit negligence. Since there can be no agreement to commit negligence, a civil conspiracy must be a conspiracy to commit some type of underlying intentional tort. <u>See</u> <u>Bevan Group 9 v. A-Best Products Co.</u>, 2004 WL 1191713 (Ohio Common Pl., Cuyahoga County, May 17, 2004) ("... Ohio law deems civil conspiracy an intentional tort");

34

Gosden v. Louis, 116 Ohio App.3d 195, 687 N.E.2d 481, 496-97 (1996). See Chesher v. Neyer, 392 F.Supp.2d 939, 959 (S.D. Ohio, W.D. 2005)

The Sixth Circuit has set forth the standard for proving a civil conspiracy claim brought under 42 U.S.C. § 1983 in Hooks v. Hooks, 771 F.2d 935 (6th Cir.1985):

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

Id. at 943-44.

"It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." Gutierrez v. Lynch, 826 F.2d 1534, 1538 (6th Cir.1987). See also Spadafore v. Gardner, 330 F.3d 849, 854 (6th Cir. 2003); Beckett v. Ford, 613 F.Supp.2d 970, 983 (N.D. Ohio, W.D. 2009);  Hampton v. Hanrahan, 600 F.2d 600, 620–21 (7th Cir.1979).

 "Unsupported conclusions and inferences are insufficient to support a charge of conspiracy. . . .  Absent any evidence of a plan to deprive the plaintiff of her civil rights, a conspiracy allegation cannot go to the jury.  Miller v. City of Columbus 920 F.Supp. 807, 822 (S.D. Ohio, E.D. 1996), affirmed, 52 Fed.Appx. 672 (6th Cir. 2002).

However,  the Sixth Circuit has also indicated that because "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, ... circumstantial evidence may provide adequate proof of conspiracy." Weberg v. Franks,229 F.3d 514, 528 (6th Cir. 2000) (alteration in original).

35

**Civil Conspiracy Under § 1985(3)**

Civil conspiracy may also be asserted as a federal civil claim under 42 U.S.C. § 1985(3).[12] Because the basis of Plaintiffs' conspiracy claim is, at best, opaque, even though Plaintiffs herein have not specifically asserted a civil conspiracy claim under this section, the Court will address Plaintiffs' conspiracy claim from this vantage point as well.

To establish a conspiracy claim under § 1985(3), a plaintiff must prove: 1) a conspiracy involving two or more individuals; 2) that the conspiracy was entered into for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; 3) an act in furtherance of the conspiracy occurred; and 4) and such act  caused injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.  Johnson v. Hills & Dales Gen. Hosp., 40 F.3d 837, 839 (6th Cir.1994), cert. denied, 514 U.S. 1066, 115 S.Ct. 1698, 131 L.Ed.2d 560 (1995).  See also Miller v. City of Columbus, supra, 920 F.Supp. at 821-22.  To establish a conspiracy under § 1985(3) a plaintiff must also prove that conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus. Griffin v.

---

[12]  42 U.S.C. § 1985(3) reads in pertinent part,

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3)

Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971).  In the instant case there is no evidence in the record that the conduct of the City of Toledo or Defendant police officers was motivated or informed by racial or other class-based discriminatory animus. Accordingly, there is no genuine dispute of material fact as to this necessary element of a § 1985(3) conspiracy claim.  Thus, as to any conspiracy claim arising out of § 1985(3), the Court finds that Defendants' motion for summary judgment is well taken and Defendants are granted summary judgment.

### Civil Conspiracy Under § 1983

Plaintiff likewise fails to prove a conspiracy claim under §1983.  As discussed, above, such claims require a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.

Certainly, in the instant case, there were the requisite two parties involved in the investigation leading up to the raid of March 24, 2010, and more than two individuals involved in the raid that took place that evening.  It is also quite clear there was an agreement among the various parties to achieve a general objective, i.e., to investigate drug activity believed to be occurring at a certain location and to execute a search warrant at that location.  Hooks v. Hooks, supra.  It is also conceivable that a rational trier of fact could view the events leading up to and of March 24, 2010, as having caused Plaintiffs to suffer some kind and degree of injury.  What is missing from this claim, however, is any evidence that the agreement into which Defendants entered was intended either to commit an unlawful act or to commit a lawful act by unlawful

37

means.  Hampton v. Hanrahan, 600 F.2d at 620–21.  As previously noted, "[u]nsupported

conclusions and inferences are insufficient to support a charge of conspiracy . . ."  Miller v. City

of Columbus 920 F.Supp. at 822.

Accordingly, as there is no genuine dispute of material fact as to this crucial element

Plaintiff's § 1983 conspiracy claim, this Court finds Defendants' motion for summary judgment

well taken and grants said motion as to this claim.

**Ohio Law of Immunity**

### Immunity for Political Subdivisions Under State Law

The State of Ohio provides statutory immunity for its political subdivisions and their

employees in civil actions.  Ohio Revised Code Chapter 2744, The Political Subdivision Tort

Liability Act, sets forth a three step method for determining whether a political subdivision of

the State of Ohio is immune from liability.  See  Walsh v. Erie County Dept. of Job and Family

Services, 240 F.Supp.2d 731, 763 (N.D. Ohio, W.D. 2003).

Step one establishes the default condition, i.e., that political subdivisions of the State of

Ohio are immune from liability.  At step one, the issue is whether the status of the defendant and

the nature of the claim asserted against it meet the preliminary requirements of establishing

immunity under  § 2744.02(A)(1) of the Ohio Revised Code, which states:

> Except as provided in division (B) of this section, a political subdivision is not
> liable in damages in a civil action for injury, death, or loss to a person or property
> allegedly caused by an act or omission of the political subdivision or an employee
> of the political subdivision in connection with a governmental or proprietary
> function.

O.R.C. § 2744.02(A)(1)

### Immunity Exceptions

38

If it is determined that the general provision of immunity applies, then the reviewing court will proceed to stage two, which involves determining whether any of the five exceptions to immunity, set forth in § 2744.02(B)(1) - (5) apply.  At stage two political subdivisions loose the presumption of immunity, if injury, death, or loss to person or property:

> (1) . . .  is caused by the negligent operation of any motor vehicle by their employees
> (2) . . .  is caused by the negligent performance of acts by their employees with respect to proprietary function[13] of the political subdivisions.
> (3) . . . is caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads....
> (4) . . . is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function....
> (5) . . . when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code....

O.R.C. § 2744.02(A)(1) & (B)(1–5).

If none of the above exceptions apply, then the political subdivision retains the presumption of immunity.   However, if one (or more) of the exceptions listed in § 2744.02(B) is found to apply, then the political subdivision would lose the immunity provided by § 2744.02(A)(1)

---

[13]   "Governmental" and "proprietary" functions have been defined as the obverse of one another. John A Gleason & Kenneth Van Winkle, Jr., Comment, The Ohio Political Subdivision Tort Liability: A Legislative Response to the Judicial Abolishment of Sovereign Immunity, 55 U. Cin. L.Rev. 501, 511 (1986)).  A "governmental function" is one that the political subdivision is obligated to perform. Id. at 510.  A  "governmental action" as one that "benefits all people of the state" and is an act not engaged in by "non-governmental entities." Id. at 511.  A "proprietary" function is  "any non-governmental function", provided it is a function that "is customarily engaged in by non-governmental entities." Id.  The determination of what is and is not a "governmental function" will necessarily involve judicial interpretation. Id.  See O.R.C. § 2744(01)(C)(1) and § 2744(01)(G)(1), defining "governmental" and "proprietary" functions, respectively.  See also  Chesher v. Neyer, 392 F.Supp.2d 939, 960-61 (S.D. Ohio, W.D. 2005)

**Defenses to Exceptions**

If an exception to immunity is found, then the analysis proceeds to stage three, where the political subdivision can assert statutory defenses to the loss of immunity.  At stage three the political subdivision's immunity can be reestablished if one of the defenses to the immunity exceptions can be found to apply.  These defenses are listed in O.R.C. § 2744.03.[14] [15]

**City of Toledo: Immunity**

In the instant case the City of Toledo, a political subdivision of the State of Ohio, is immune as provided in O.R.C. § 2744.02(A)(1).  Review of the record evidence fails to show any genuine dispute of material fact that would render applicable any of the immunity exceptions of  O.R.C. § 2744.02(B).  Specifically, Defendant City of Toledo is immune since the present action does not involve: (1)  a motor vehicle (see O.R.C. § 2744.02(B)(1)), (2) proprietary function (see O.R.C. § 2744.02(B)(2)), (3) public road (see O.R.C. § 2744.02(B)(3)), or (4) public building (see O.R.C. § 2744.02(B)(4)).  As to the fifth statutory immunity exception, O.R.C. § 2744.02(B)(5),  that "civil liability is expressly imposed upon the political subdivision by a section of the Revised Code . . ." Plaintiffs have not pointed to any statute or section of the Revised Code that expressly imposes civil liability on the City.  Accordingly, this Court finds

---

[14]   § 2744.03 cannot be used as an independent basis to impose liability. Cater v. City of Cleveland, 83 Ohio St.3d 24, 697 N.E.2d 610, 617 (1998) ("Appellants further contend that R.C. 2744.03(A)(5) provides an independent basis for imposing liability on the city. We reject this contention.... R.C. 2744.03(A)(5) is a defense to liability; it cannot be used to establish liability."). See Cline v. City of Mansfield 745 F.Supp.2d 773, 838 (N.D. Ohio, E.D. 2010).

[15]   The defenses afforded political subdivision include, for example, (1)  performance of a judicial, quasi-judicial, prosecutorial, legislative, or quasi-legislative function, (5) the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, (7) both the political subdivision and persons functioning in the capacity of attorneys representing political subdivision are entitled to immunity.

that there is no genuine issue of material fact as to the liability of Defendant City of Toledo and, thereby, grants Defendants Motion for Summary Judgment as to Defendant City.

### Immunity for Individuals Under State Law, Generally

The determination of an individual employee's entitlement to immunity is a question of law. Conley v. Shearer, 64 Ohio St.3d 284, 292, 595 N.E.2d 862 (1992).  Essentially, even as to the employees of political subdivisions, immunity is the default condition and will attach to the conduct of such employees, unless one of the exceptions applies.   Miller v. Leesburg, 87 Ohio App.3d 171, 175, 621 N.E.2d 1337 (1993); Walsh v. Erie County Dept. of Job and Family Services, 240 F.Supp.2d 731, 763 (N.D. Ohio, W.D. 2003).

Ohio Rev.Code § 2744.03(A), at sub subsection (6), extends the grant of immunity that § 2744.01(A) affords political subdivisions to  all employees of a political subdivision.

(6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:

This grant of immunity shields employees, unless one of the exceptions applies

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. . . .

O.R.C. § 2744.03(A)(6).  Morrison v. Board of Trustees of Green Tp., 529 F.Supp.2d 807, 835 (S.D. Ohio, W.D. 2007).

State courts in Ohio have determined that even where a police officer's actions violated

an arrestee's constitutional rights, the officer was not necessarily subject to liability.  The state courts have found that even though an officer's conduct is "not as thorough as it could have been," such conduct, if it is merely negligent, is not sufficient "to remove the cloak of immunity." Boyd v. Village of Lexington, No. 01–CA–64, 2002 WL 416016, at *6 (Ohio Ct.App. Mar. 14, 2002).  See Radvansky v. City of Olmsted Falls, 395 F.3d 291, 316 (6th Cir. 2005).

**Cause of Action No. 4: Assault and Battery**

Plaintiffs assert the state law claim that Defendants Sweat and John Does committed actionable assault and battery against them incident to the raid of March 24, 2010.

"An assault in tort is the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact." Vandiver v. Morgan Adhesive Co., 126 Ohio App.3d 634, 710 N.E.2d 1219, 1221 (1998) (citation and internal quotation omitted).  Similar to, but distinguishable from, a civil assault is, civil battery, which goes one step beyond civil assault, and includes "an intentional, nonconsensual touching." Watkins v. Cleveland Clinic Found., 130 Ohio App.3d 262, 719 N.E.2d 1052, 1064 (1998).

In the circumstance where the person engaging in the above described behavior is not a police officer acting within the scope of his employment, a claim for civil for assault and battery could present a genuine dispute of material fact.  However, where such conduct is attributed to a police officer acting in his official capacity, such as in effectuating a stop or controlling a crime scene, the law provides that a police officer is privileged to make such contact as may be necessary to execute properly his duties and is, thus, protected by governmental immunity, unless the plaintiff can establish that the officer acted "manifestly outside the scope of [her]

42

employment or official responsibilities," acted "with malicious purpose, in bad faith, or in a wanton and reckless manner," or in a manner for which liability can be imposed under some other law of the State of Ohio. See Ohio Rev.Code § 2744.03(A)(6)(a)-(c). Hale v. Vance 267 F.Supp.2d 725, 736 (S.D. Ohio, W.D., 2003).

The question in the present case is whether Defendant officers are entitled to immunity under Ohio Rev.Code § 2744.03.

The Ohio Supreme Court has held that "the issue of wanton misconduct is normally a jury question." Fabrey v. McDonald Vill. Police Dept., 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1994).  See also Campbell v. City of Springboro, Ohio, 788 F.Supp.2d 637, 681-82 (S.D. Ohio, W.D. 2011).  Accordingly, a law enforcement officer may be found liable for the civil tort of assault and battery if it can be established that the officer used unreasonable force in the course of an arrest. See D'Agastino v. City of Warren, 75 Fed.Appx. 990, 995 (6th Cir.2003) ("If an officer uses more force than is necessary to make an arrest and protect himself from injury, he is liable for assault and battery" under Ohio law.); Knox v. Hetrick, No. 91102, 2009 WL 792357, at *8 (Ohio App. 8 Dist. Mar. 26, 2009).

Despite the pronouncement by the Ohio Supreme Court, in Fabrey, supra - that it is better left to the jury to determine whether such conduct by a police officer is wanton or reckless, and, thus, constitutes actionable assault and battery - this Court is nonetheless bound to consider the threshold question, which is whether there is a genuine dispute of material fact as to whether Defendant police officers used  inappropriate force in controlling and/or arresting Plaintiffs or otherwise acted manifestly outside the scope of their employment or official responsibilities or acted with malicious purpose, in bad faith, or in a wanton and reckless manner and thereby

43

committed assault and battery.

Having reviewed the fact sources in this case, the Court finds that there is no genuine dispute of material fact regarding Defendants' conduct during the raid of March 24, 2010 as it pertains to Plaintiffs' claims of civil assault and battery. Under the circumstances of the raid, given the conditions that the police reasonably anticipated they might likely confront, and especially considering that the Officer Sweat had been advised by the CI that he/she had observed a firearm in the premises where he/she made the purchase, the actions of the Defendants (e.g., handcuffing Plaintiffs, forcing Plaintiffs to sit, instructing Plaintiffs to be silent and not disruptive) in seeking to control the search environment fell well inside the scope of their official responsibilities of controlling what at the time they reasonably believed to be a potentially volatile, and possibly lethal, crime scene.

That Plaintiffs' protested and questioned the presence of the police in their residence is quite understandable, yet from the perspective of law enforcement at the time of the raid, such conduct only served to make that environment more chaotic and unpredictable, thereby warranting the measures used to impose control over the search environment. Accordingly, it is the view of this Court that no rational trier of fact could take the evidence thus far presented in this case, interpreted in a light most favorable to Plaintiffs, and find that, Defendant's interactions with Plaintiffs rose to the level of actionable assault and/or battery. Therefore, this Court grants Defendants' Motion for Summary Judgment as to Plaintiffs' claim of assault and battery.

**Cause of Action No. 5: Emotional Distress**

Plaintiffs claim that Defendants Sweat and John Does caused them to suffer actionable

emotional distress.  It is unclear from Plaintiffs' pleadings whether they are asserting that Defendants negligently, recklessly or intentionally caused them to suffer emotional distress.  For purposes of completeness, this Court will address Plaintiffs' emotional distress claim as to each of these possibilities.

**Negligent Infliction of Emotional Distress**

Under Ohio law, a plaintiff can recover for negligent infliction of emotional distress where such injuries are both serious and reasonably foreseeable. Paugh v. Hanks, 6 Ohio St.3d 72, 451 N.E.2d 759, 765 (1983).  An emotional injury is serious where "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." Id.  An emotional injury is reasonably foreseeable where a reasonable person in defendant's circumstance would recognize that an act is likely to result in injury to someone. Id. at 766.[16]

---

[16]    Traditionally, the claim of negligent infliction of emotional distress, is reserved for persons who are in the vicinity of an event and is not intended to apply to those who are the victims of an event.   For example, a mother who would see her adolescent child hit by a car could possibly recover for emotional injury under a theory of negligent infliction of emotional distress.   However,  the adolescent victim of the automobile accident, is limited to recovering for emotional harm as an element of general damages. See e.g., Schultz v. Barberton Glass Co., 4 Ohio St.3d 131, 447 N.E.2d 109 (1983) (abrogating the contemporaneous physical injury rule and recognizing a claim for negligent infliction of emotional distress). See Wells v. City of Dayton,  495 F.Supp.2d 797 (S.D. Ohio, W.D. 2006).

When determining whether an allegedly negligently inflicted emotional injury is reasonably foreseeable courts will look to various factors including: the nearness of the plaintiff to the scene of the accident or event; whether the plaintiff directly observed the accident or event, or learned of it afterward; and whether the plaintiff and the victim were closely related. Id. To be the victim of the negligent infliction of emotional distress, it is not necessary that a plaintiff actually observe the incident: "a contemporaneous observance of the accident through the sense of hearing will enhance the likelihood that the emotional injury was reasonably foreseeable." Id. Additionally, the plaintiff and the victim need not be related by blood. Id.

Thus, for Plaintiffs to be able to maintain a claim for negligent infliction of emotional distress, they each would be required to maintain that what they observed of the manner in which

However, this Court need not address this issue.  In Ohio, government employees are immune from liability for actions related to, or undertaken in connection with, a governmental or proprietary function, unless the employee's actions were malicious, in bad faith, or wanton or reckless. Ohio Rev.Code § 2744.03(A)(6)(b). No exception applies for negligence in connection with a governmental function. Ward v. County of Cuyahoga, 721 F.Supp.2d 677, 695 (N.D. Ohio, E.D., 2010).  Accordingly, there is no genuine dispute of material fact as to Plaintiffs' claim of negligent infliction of emotional distress and Defendants are granted summary judgment as to this issue.

**Intentional or Reckless Infliction of Emotional Distress**

Under Ohio law, reckless infliction of emotional distress and intentional infliction of emotional distress are the same cause of action.  Ward v. County of Cuyahoga, 721 F.Supp.2d at 695, fn 8; Davis v. City of East Cleveland, No. 1:03 CV 2075, 2006 WL 753129, at *15 n. 4, 2006 U.S. Dist. LEXIS 11913, at *47 n. 4 (N.D. Ohio March 21, 2006) (citing Russ v. TRW, Inc., 59 Ohio St.3d 42, 570 N.E.2d 1076, 1083 (1991)).

To recover on a claim of intentional infliction of emotional distress, a plaintiff must establish four elements:

> (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered

---

Toledo police personnel handled the other during the execution of the search warrant was so traumatizing that they were caused to suffer emotional distress.   A review of Plaintiffs' Complaint and the evidence thus far presented to the Court does not disclose a genuine dispute of material fact as to the necessary elements of this claim.

as "utterly intolerable in a civilized community," (3) that the actor's actions were the proximate cause of plaintiff's psychic injury, and (4) that the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it."

Roelen v. Akron Beacon Journal, 199 F.Supp.2d 685, 696 (N.D. Ohio 2002), (quoting Pyle v. Pyle, 11 Ohio App.3d 31, 463 N.E.2d 98, 103 (1983) ).  See also  Rodriguez v. City of Cleveland, 619 F.Supp.2d 461, 485 (N.D. Ohio, E.D., 2009), affirmed in part, reversed in part, Rodriguez v. City of Cleveland, 439 Fed.Appx. 433 (6th Cir. 2011).

Conduct that is merely cruel or insensitive does not reach the threshold of the sort of extreme and outrageous conduct that is necessary to establish a claim of intentional infliction of emotional distress. Roelen, 199 F.Supp.2d at 696.  Additionally, where there is no actual physical injury, the claimed emotional distress must be severe and disabling to be compensable. See Paugh v. Hanks, supra, 6 Ohio St.3d 72, 451 N.E.2d 759 at 765.  For a plaintiff to prevail on such a claim there must be a showing of some guarantee of genuineness, e.g., expert evidence will prevent dismissal of a claim of intentional infliction of emotional distress.  See, e.g., Knief v. Minnich, 103 Ohio App.3d 103, 658 N.E.2d 1072, 1075 (1995).

Thus, for a court to allow a plaintiff's claim for intentional infliction of emotional distress to move past the summary judgment stage, it must determine both that the claimant's alleged emotional injury was sufficiently serious and that the defendants' alleged conduct was sufficiently extreme and outrageous that proceeding to trial before a fact finder would be warranted.  Popson v. Danbury Local School Dist., No. 304–cv–7056, 2005 WL 1126732, at *12 (N.D.Ohio April 28, 2005); Kovac v. Lowe's Home Ctrs., Inc., No. 5:05–cv–2276, 2006 WL 1644336, at *9 (N.D.Ohio June 7, 2006.).  See also Rodriguez, supra, 619 F.Supp. at 485-86.

In the present case the Defendants' conduct - i.e., breaking down Plaintiffs' front door,

47

searching through Plaintiffs' belongings,  placing handcuffs on Plaintiffs, forcing Plaintiffs to sit

on the floor while Defendants conducted their search of Plaintiffs' apartment, forcefully

instructing Plaintiffs to stop talking - even when viewed from a standpoint that is most favorable

to the Plaintiffs -  does not rise to the level of presenting a genuine dispute of material fact as to

the question of whether Defendants' handling of Plaintiffs was so extreme and outrageous as to

go "beyond all possible bounds of decency" or to be "utterly intolerable in a civilized

community."   Additionally, Plaintiffs have not presented any concrete evidence, beyond the

bare assertion, that raises a genuine dispute of material fact that they suffered genuine and severe

mental anguish as a result of the Defendants' conduct.   Therefore, the Court grants summary

judgment in favor of the Defendants on Plaintiffs' emotional distress claim to the extent that

Plaintiffs have asserted a claim for reckless or intentional infliction of emotional distress.

**VII.  Conclusion**

For the reasons set forth above, the Magistrate Orders that Defendants' Motion for

Summary Judgment is Granted as to Causes of Action 1, 3, 4, 5 and 6 but that  this Court retains

jurisdiction over Plaintiffs' Cause of Action No. 2, excessive force.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   July 30, 2012

48